UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>SAFEMOON LLC, SAFEMOON US LLC, KYLE NAGY, BRADEN JOHN KARONY AND THOMAS GLENN SMITH,<br><br>Defendants, | No. __________<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges as follows:

**SUMMARY OF ACTION**

1. Beginning in March 2021, SafeMoon LLC, SafeMoon US LLC (together, "SafeMoon"), SafeMoon LLC's creator and founder Kyle Nagy ("Nagy"), and SafeMoon's Chief Executive Officer ("CEO") John Karony ("Karony") and Chief Technology Officer ("CTO") Thomas Smith ("Smith") ("Defendants") perpetrated a massive fraudulent scheme that generated millions through the unregistered offer and sale of a crypto asset security called the SafeMoon Token. During the course of the fraud, the SafeMoon Token's market capitalization skyrocketed to billions of dollars in only two months. That value quickly plummeted when the scam was discovered, leading to significant losses to investors. Meanwhile, Defendants profited by misappropriating from the project crypto assets worth tens of millions of dollars.

2. Between March 12, 2021 and April 20, 2021, the trading volume of the SafeMoon Token on crypto asset trading platforms also skyrocketed and its market price soared by over

55,000%. The total market value of the SafeMoon Token also experienced a meteoric rise to over $5.7 billion.




Ultimately, more than 2.8 million unique addresses have held SafeMoon Tokens since its inception on the distributed digital ledger (or "blockchain") in which it was represented.

3. As part of their scheme, Defendants used a so-called "liquidity pool" through which SafeMoon Token holders were able to "swap" their SafeMoon Tokens for "BNB Tokens," another crypto asset security, which is associated with the "Binance Smart Chain" blockchain (now known as the BNB Chain).[1] This exchange would take place through a so-called "liquidity pool" (the "SafeMoon LP"), which consisted of a "smart contract" (generally speaking, self-executing computer code) that ran on a so-called "decentralized exchange" known as PancakeSwap. The SafeMoon LP allowed users to swap SafeMoon Tokens with BNB Tokens. In his marketing materials, whitepaper, and website, Nagy represented that each SafeMoon Token transaction would be subject to a 10% "tax"—5% would be returned to SafeMoon Token

[1] The liquidity pool actually used a "wrapped" token, called "wBNB," that was compatible with the BNB Chain.

holders as a quasi-dividend, and 5% would be deposited and retained in the SafeMoon LP. Smith and Karony repeated and disseminated these false representations in social media posts and other communications with the public.

4. Critically, Nagy represented in marketing materials, his whitepaper, and website that these retained assets would be "locked" and inaccessible for at least four years. Smith and Karony repeated and disseminated these false representations in social media posts and other communications with the public. According to Defendants, this purported safety feature would protect assets from being misappropriated (or having the "rug pulled" in crypto asset market terms). What the Defendants failed to disclose, however, was that whenever tokens were deposited to the SafeMoon LP from the 5% tax, the Defendants received "liquidity provider tokens" ("LP Tokens") as a result. Accordingly, as Defendants well knew, the assets in the SafeMoon LP were not locked because the LP Tokens allowed the Defendants to withdraw retained assets from the SafeMoon LP at will—which, in fact, is what the Defendants repeatedly did.

5. In direct contravention to their public representations, the Defendants repeatedly raided the retained assets from the SafeMoon LP by redeeming LP Tokens they received when tokens were deposited into the SafeMoon LP as part of the 5% tax on each SafeMoon Token transaction. The Defendants claimed in their marketing materials, website, whitepaper, and public statements, that removing funds from the SafeMoon LP was something that they could not do. After Karony and Smith were confronted with their lies, however, they changed their story and represented that they would not remove funds from the SafeMoon LP without first disclosing their intended use to the public. This was also a false statement because they continued to withdraw assets from the SafeMoon LP without public disclosure.

6. As the SafeMoon Token grew exponentially in value, the Defendants used their LP Tokens to redeem tens of millions of dollars' worth of tokens from the SafeMoon LP, which they then used for various purposes, including manipulation of the SafeMoon Token market, business expenses, investments in unrelated companies, and personal uses such as to purchase luxury homes, McClaren sports cars, and extravagant travel.

7. On or about April 21, 2021, after it became public that the Defendants had the unfettered ability to remove assets from the SafeMoon LP, the SafeMoon Token price plummeted nearly 50%. After this plunge, the Defendants engaged in another scheme to manipulate the price of the SafeMoon Token through carefully timed asset purchases.

8. By engaging in the conduct alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2), 78j(b)]; and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Defendants will continue to violate the federal securities laws unless they are restrained and enjoined by this Court.

## JURISDICTION AND VENUE

9. The SEC brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t, 77v] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78aa] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object.

10. The Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act, [15 U.S.C. § 77v(a)], and Section 27(a)

of the Exchange Act, [15 U.S.C. § 78aa(a)], because, among other things, some of the acts and transactions in which Defendants engaged and that constitute violations of the federal securities laws occurred in this District. For example, as alleged herein, Defendants offered and sold securities to investors located in this District in unregistered transactions.

11. In addition, this Court has personal jurisdiction over Defendants because Defendants engaged in conduct within the United States that constituted significant steps in furtherance of the violations of the federal securities laws alleged in this Complaint and/or further because Defendants, whether within or outside of the United States, engaged in conduct that had a foreseeable substantial effect within the United States.

12. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange—namely, through Defendants' use of the Internet and the U.S. banking system when engaging in the acts and transactions described herein.

## DEFENDANTS

13. SafeMoon LLC is a Utah LLC organized on March 18, 2021, with a registered address in Provo, Utah. It was formed shortly after the SafeMoon project launched and was used to conduct early business operations. The LLC's members were Karony, Nagy, and Tano LLC, of which Smith was a 10% owner. SafeMoon LLC initially operated via a three-person board consisting of Karony, Nagy, and Smith. Karony was the registered agent of SafeMoon LLC, which never registered any class of securities with the Commission.

14. SafeMoon US LLC is a Utah LLC organized on June 14, 2021, with its principal place of business in Pleasant Grove, Utah. SafeMoon US LLC was owned and controlled by Karony. After formation, SafeMoon US LLC was used in connection with the SafeMoon Token operations. SafeMoon US LLC never registered any class of securities with the Commission.

15. Nagy, age 35, was a resident of Vero Beach, Florida who was responsible for the creation of the SafeMoon Token and the related whitepaper. Nagy never voluntarily revealed his identity, but instead partnered with Smith and Karony to be the public faces of the business. Nagy controlled the SafeMoon Token smart contract owner[2] address ("SafeMoon Contract Owner Address") from its inception in March 2021 until April 2021, and shared control of it with Karony and Smith once they joined SafeMoon around March 12, 2021. Nagy has never been registered with the Commission in any capacity.

16. Karony, age 27, was a resident of Provo, Utah. Karony has served as SafeMoon's CEO since March 2021. Prior to SafeMoon, Karony operated a small software company. Karony interacted frequently with the public to promote the SafeMoon Token. Karony controlled SafeMoon LLC and SafeMoon US LLC. In September 2021, the SafeMoon Contract Owner Address was transferred to a new address under Karony's sole control. Karony has never been registered with the Commission in any capacity.

17. Smith, age 35, was a resident of Bethlehem, New Hampshire who served as SafeMoon's first CTO from March 2021 until around November 2021. Smith also interacted

[2] Smart contracts are self-executing code deployed on a blockchain that perform "if/then" computations. Smart contracts can govern the issuance and distribution of tokens on a blockchain, and typically those who deploy such smart contracts can control them through administrative access rights.

frequently with the public to promote the SafeMoon Token. Smith has never been registered with the Commission in any capacity.

**BACKGROUND ON SECURITIES OFFERINGS**

18. Congress enacted the Securities Act nearly a century ago to regulate the offer and sale of securities. In contrast to the commercial principle of *caveat emptor*, Congress established a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient and accurate information to allow investors to make informed decisions before they invest.

19. Sections 5(a) and 5(c) of the Securities Act require issuers of securities to register offers and sales of those securities with the SEC when they offer and sell securities to the public. Registration statements relating to an offering of securities provide investors with important information about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

20. The Securities Act and Exchange Act also contain anti-fraud provisions to prevent fraudulent conduct in the offer, sale, and purchase of securities. Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, for example, seek to ensure honest behavior and fair dealing in securities transactions.

21. Congress used a broad definition of "security" in the Securities Act and Exchange Act. A "security" encompasses a wide range of investments, including investment contracts. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or

managerial efforts of others. In this case, SafeMoon offered and sold SafeMoon Tokens as securities.

**BACKGROUND ON CRYPTO ASSETS**

22. The term "crypto asset" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "digital assets," "virtual currencies," "digital coins," and "digital tokens."

23. A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

24. Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger. Crypto assets may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

25. A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates.

26. On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report were offered and sold as investment contracts and, thus, securities.

# FACTS

## A. The History of the SafeMoon Token

27. On March 1, 2021, Nagy launched the SafeMoon Token through the use of a "smart contract" that he controlled and deployed on the Binance Smart Chain blockchain. At launch, Nagy "minted" one quadrillion SafeMoon Tokens, burned 223 trillion of them,[3] and transferred the remaining 777 trillion to another smart contract that was programmed to conduct an automated sale of the tokens upon receipt into the smart contract. Nagy's purported vision for SafeMoon, as stated in his marketing materials, was to create a supposedly "entirely community driven" and "self-regenerating automatic liquidity providing protocol" that would pay out rewards to token holders and penalize sellers.

28. Nagy, the creator and founder of SafeMoon, initially attracted investors to the SafeMoon Token through promotional materials for which he had ultimate authority. Specifically, Nagy had the sole and ultimate authority over the content and dissemination of SafeMoon's presale marketing materials, the SafeMoon website, and the SafeMoon whitepaper. Nagy also promoted SafeMoon's offering by touting its profitmaking opportunities, which he dubbed "tokenomics." Nagy marketed the SafeMoon Token's ability to generate profits for investors through features that, according to the SafeMoon whitepaper and website, would "drive the price to stratospheric all-time highs" or "Safely to the Moon."

[3] Burning crypto assets involves transferring them to a blockchain address that cannot be used for any other purpose than to receive assets. Burning crypto assets often is done for the purpose of increasing the market value of those crypto assets by decreasing the supply in circulation.

29. For example, SafeMoon publicly touted plans to burn SafeMoon Tokens to "keep the community rewarded and informed" and to potentially increase the price of the asset by reducing its circulating supply.

30. In addition, according to its website, SafeMoon "[h]olders can earn passive income and watch their balance grow indefinetely [sic]." As stated in the whitepaper:

> [T]he reflect mechanism encourages holders to hang onto their tokens to garner higher kick-backs which are based upon a percentages [sic] carried out and dependent upon the total tokens held by the owner. In theory, with the manual burn function … even a small holder at the beginning could potentially walk away with big money at the end of the token's lifespan.

This mechanism was one of SafeMoon's central marketing features that the Defendants actively promoted.

### B. The SafeMoon Token Presale and Initial Decentralized Exchange Offer, and its Rapid Adoption by the Crypto Asset Community

31. Nagy created the SafeMoon LP, which consisted of the token pair SafeMoon Token and BNB, on a crypto asset trading platform called PancakeSwap.[4] The SafeMoon LP was initially funded by a "presale" of the SafeMoon Token, which was open to the public.

---

[4] Through such a platform, users can create "liquidity pools," typically consisting of two or more crypto assets, which are then available for other participants who want to exchange one of those crypto assets for another. Depositors to the liquidity pool are generally referred to as "liquidity providers." They typically deposit a number of crypto asset pairs into the liquidity pool and receive in return a crypto asset, often referred to as a "liquidity provider token" or "LP token," which represents their *pro rata* interest in the liquidity pool and is redeemable at any time for their slice of the pool, typically including accrued trading fees. Typically, participants who trade with a liquidity pool deposit a certain number of crypto asset A and receive a certain number of crypto asset B. The exchange rate between A and B is automatically determined according to a preset formula that is based on the ratio of assets held by the pool and is designed to programmatically adjust prices to match market prices. Thus, as the ratio of crypto asset A to crypto asset B increases, the liquidity pool price of crypto asset A decreases and the price of crypto asset B increases.

32. The presale was the first step in the offering of SafeMoon Tokens to the public using a liquidity pool, a process known in the crypto asset industry as an "Initial Decentralized Exchange Offer" or "IDO."

33. Presale marketing materials posted on the internet by Nagy under the pseudonym "SafeMoon Protocol" represented that all presale "profits" would be automatically transferred into the SafeMoon LP and that SafeMoon Tokens would then be listed on PancakeSwap at four times the presale price, allowing investors to "walk away with an easy 4x gain."

34. SafeMoon Tokens were sold in the presale at one trillion SafeMoon Tokens per BNB. This meant that, at the then-prevailing market price for BNB, 100 billion SafeMoon Tokens cost approximately $2.35.

35. During the presale, Nagy purchased three trillion SafeMoon Tokens for 0.3 BNB (approximately $75 at the time) from the presale smart contract, or $0.0000000000235 per SafeMoon, the same price as the other presale investors. Within hours of its March 1, 2021 launch, the presale reached its "hardcap," *i.e.*, prescribed limit, of 70 BNB (approximately $16,500 at the time).

36. When the presale closed on March 2, 2021, 30 addresses immediately claimed about 694 trillion tokens from the presale smart contract, and the presale smart contract simultaneously transferred 63 trillion SafeMoon Tokens and 61.74 BNB to PancakeSwap to establish the SafeMoon LP.

37. With this amount of SafeMoon Tokens and BNB deposited in the SafeMoon LP, one BNB could buy 1.02 SafeMoon Tokens, or $0.00000000024 per SafeMoon Token at then-prevailing market prices for BNB. This means that the price of the SafeMoon Tokens was instantly ten times higher than the amount investors had paid for the tokens hours earlier,

representing a nearly 1,000% instant return (or 10x) for investors that bought SafeMoon Tokens in the presale.

38. Once Nagy established the SafeMoon LP on PancakeSwap, anyone could access PancakeSwap and buy the SafeMoon Token without limitation—the second step in the plan to distribute the SafeMoon Token to the public. SafeMoon Tokens were tradable through the SafeMoon LP and later through other crypto asset trading platforms.

39. No registration statement was filed or in effect at any time as to any offer or sale of SafeMoon Tokens—not the offers or sales during the presale, nor the offers or sales once the token was available for trading via the SafeMoon LP.

40. Defendants represented to potential investors that they could expect substantial returns. Following the Defendants' marketing campaign, the price and trading volume of the SafeMoon Token on crypto asset trading platforms skyrocketed, increasing in price by more than 55,000% from March 12, 2021, when it had a price of $0.00000002, to when it reached its all-time high of $0.00001118 on April 20, 2021. The Token's total market value also experienced a meteoric rise to over $5.7 billion during this time frame and was held by more than 2.8 million unique addresses.

**C. SafeMoon Tokens were Offered and Sold in a Series of Unregistered Securities Transactions**

41. Defendants offered and sold SafeMoon Tokens as investment contracts and, therefore, as securities. SafeMoon Token purchasers invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others, in this case, the Defendants.

42. Purchasers obtained SafeMoon Tokens in exchange for an investment of money in the form of BNB another crypto asset security on the BNB Chain.

43. Purchasers of SafeMoon Tokens invested into a common enterprise with other investors. SafeMoon Tokens are fungible with each other, all investors shared equally in price increases—or together suffered price decreases—of the SafeMoon Token. Further, SafeMoon Token investors received a *pro rata* distribution of profits in at least two ways based on the "tokenomics" features of the SafeMoon Token. First, half of the tax on every SafeMoon Token transaction was redistributed to existing holders as a "static reward" or "reflection," which were dividend-like payments that benefited investors directly in proportion to their ownership of SafeMoon Tokens. In addition, SafeMoon represented that they would conduct periodic manual "burning" of SafeMoon Tokens to deflate the supply of available SafeMoon Tokens, which purportedly increased the market price of the SafeMoon Tokens, benefitting SafeMoon Token holders proportionally to their ownership.

44. Moreover, in addition to holding SafeMoon Tokens, Defendants accumulated LP Tokens generated from "taxes" on SafeMoon transactions, which allowed them to redeem assets from the SafeMoon LP. Accordingly, SafeMoon's financial fortunes were inexorably tied to SafeMoon Token investors' financial fortunes.

45. Purchasers of SafeMoon Tokens reasonably expected to profit from the efforts of others, in this case, the Defendants. At its inception, SafeMoon's whitepaper stated that SafeMoon "tokenomics" would "drive the price to stratospheric all-time highs," or as its website proclaimed, "[s]afely to the Moon."



46. After the SafeMoon Token launch in early March 2021, Nagy continued to publicize the offering on the website and the whitepaper, and social media accounts he controlled, including at X (formerly known as Twitter), Discord, Medium, and Telegram. The Defendants took numerous intentional steps to help fuel a dramatic increase in the SafeMoon Token's market price, including a social media campaign further touting the SafeMoon Token's purported safety from "rug pulls" as well as its price, total market value, and trading volume increases; the rapidly rising number of token holders and social media followers; and the token's standing on the "Top Mover" list on CoinMarketCap, a crypto asset market data website.

47. This publicity campaign, aimed at current and potential investors, promoted a reasonable expectation for outsized returns based upon the Defendants entrepreneurial and managerial efforts with respect to the SafeMoon Token. Exploiting imagery widely understood in the crypto asset markets to connote astronomical trading gains, SafeMoon tweeted hundreds of rocketship and moon emojis from their official X account. The image below is an illustrative example.




48. SafeMoon also published numerous tweets detailing how the Defendants' efforts would allow SafeMoon Token to trade on various crypto asset trading platforms, thereby increasing SafeMoon Token's market value:






49. From his personal X account, Karony further touted SafeMoon's efforts to bolster the SafeMoon Token:




50. The Defendants also organized SafeMoon Token giveaways on social media and developed additional software to assist investors in trading the SafeMoon Token. SafeMoon advertised that it retained ownership of the SafeMoon smart contract, which allowed it to execute privileged functions, such as setting the "tax" rate and liquidity fees. SafeMoon also claimed that it would continue to make "strategic plays in regards to long term growth of the community and the project." In addition, SafeMoon publicly announced when they would burn SafeMoon Tokens, demonstrating their continued involvement with managing its trading price and volume.






51. SafeMoon also tweeted imagery and language associated with traditional stock market investments, further linking the SafeMoon Token's prospects to that of a traditional stock market investment.




**D. Nagy Falsely and Repeatedly Represented that the Assets Retained in the SafeMoon LP Were "Locked" and Inaccessible**

52. A significant risk with certain crypto asset offerings is the potential for developers who control the associated smart contracts, like Nagy, Smith and Karony, to misappropriate funds held in the associated smart contract. After he launched SafeMoon, Nagy repeatedly and falsely represented that the assets retained in the SafeMoon LP were protected from misappropriation by the project's developers. Nagy made these false and misleading statements in SafeMoon's presale marketing materials, the SafeMoon website, and the SafeMoon whitepaper. Nagy had the ultimate authority over the content and dissemination of the false and misleading statements in the presale marketing materials, the website, and the whitepaper.

53. SafeMoon's presale marketing materials, which Nagy started to disseminate to investors in early March 2021, stated falsely that (1) the liquidity generated from the SafeMoon

Token presale would be "force lock[ed]" for over four years "to foster trust in the contract"; (2) "5% of all trades are auto-locked inside [the] liquidity provider on PancakeSwap" and automatically locked liquidity "guarantees that the token cannot be rugged by the dev[eloper] simply by removing the [SafeMoon] LP"; and (3) SafeMoon was "Completely Rug Free."

54. SafeMoon's website, which Nagy launched on March 6, 2021, stated (1) the "automatically generating liquidity" contributed by every trade in PancakeSwap was "locked forever"; (2) "Rug-pull impossible"; and (3) SafeMoon "#safu" (slang for safe).




55. SafeMoon's whitepaper similarly contained a "Step-by-Step Plan to Ensure 100% Safety," which included "LP Locked … for 4 years" and "LP Generated With Every Trade & Locked On Pancake[Swap]."



56. Nagy knew or was reckless in not knowing that these statements were materially false and misleading. Nagy programmed the SafeMoon LP code, meaning that he knew that there was no such LP Token lock mechanism, as he falsely told the public.

57. The SafeMoon Token smart contract source code, which Nagy posted on GitHub (a code repository) in early March 2021, also explained that it would "foster trust in the community by auto-locking liquidity for 4 years" assuring once again "no rug is possible."

58. Karony and Smith, at various times, also disseminated the false information that the assets held in the SafeMoon LP were protected from misappropriation. For example, Karony, as SafeMoon's CEO, directed Nagy to send the whitepaper to a SafeMoon employee, and Smith, in turn, instructed the employee to use the information in the whitepaper to answer questions from the community. Karony also represented on occasion to the SafeMoon investor community that the assets in the SafeMoon LP were protected from misappropriation or "locked." As alleged above, this was not true because the Defendants continuously accumulated LP Tokens from "taxed" SafeMoon Token transactions, which allowed them improperly to remove these retained assets from the SafeMoon LP at will.

59. Contrary to these assertions, Nagy did not protect assets in the SafeMoon LP from misappropriation by the project's developers. Within two weeks of the SafeMoon Token launch, Nagy had already redeemed LP Tokens to transfer more than $500,000 worth of purportedly "locked" retained assets from the SafeMoon LP to the SafeMoon Contract Owner Address under his control.

60. Moreover, from the beginning Karony and Smith, like Nagy, knew or recklessly disregarded, that these statements were materially false and misleading. As early as March 16, 2021, in a conversation between Karony and Smith, Karony candidly observed, "we could also

just update the whitepaper [to say SafeMoon LP assets would be used for business development] … we could literally just put it in the whitepaper and call it a day." Smith responded that the whitepaper could be "much better." But neither Karony nor Smith disclosed the truth to public investors at this time.

**E. When Caught, the Defendants Doubled Down on their Misrepresentations and Misappropriated Assets Held in the SafeMoon LP**

61. On April 20, 2021, which turned out to be the date of SafeMoon Token's all-time high price, a social media account called "WarOnRugs" tweeted a "Scam Advisory" about SafeMoon and the SafeMoon Token. The advisory asserted that the smart contract owner controlled a majority of the SafeMoon LP and could pull tokens from it.




62. This warning—which was correct—exposed the falsity of Defendants' public claims that they could not pilfer assets held in the SafeMoon LP.

63. Instead of acknowledging their fraud, however, the Defendants doubled down. That same day, Karony responded to a large group of his followers on a separate social media platform that the post by "WarOnRugs" was "biased, [because] the original poster supports another coin so what they are saying is biased." He went on to reiterate that the "5% LP is Split, 2.5% goes to locked LP, and the other 2.5% is manually locked or left alone if needed for dev

costs or to SEED DEXS AND EXCHANGES." Just minutes later, Nagy wrote privately to Karony that this statement was wrong. Nagy explained, candidly and contrary to how he previously marketed the SafeMoon Token to the public, "5% liquidity is added to the contract owner address. 2.5% is not ever locked."

64. The following day, April 21, 2021, Karony sent out a series of tweets where he admitted that what the Defendants had described as liquidity pool "locking" was not "automatic" at all, but rather within SafeMoon's discretion. Karony also tweeted about the circumstances where the Defendants would use the SafeMoon LP assets they previously claimed were locked:




WE ARE FOCUSED ON THE FUTURE, AND UNDERSTAND THAT SITUATIONS ARISE WHICH MAY REQUIRE THE USE OF THE LP. USES INCLUDE: SEEDING OTHER EXCHANGES AND DEX'S, DEVELOPMENT COSTS OF FUTURE SAFEMOON INNOVATIONS.

8:09 AM · Apr 21, 2021

65. Karony misleadingly assured his twitter followers that he would alert them before making use of any funds from the SafeMoon LP, which he falsely represented was a "last resort" for SafeMoon.




IF YOU WATCHED OUR AMA'S, YOU WOULD HAVE KNOWN THAT THE LP IS A LAST RESORT, AND WE WILL PUBLICLY GO TO THE COMMUNITY AND LET YOU KNOW IF THE LP WILL BE USED AND WHAT FOR, AHEAD OF TIME. #SAFEMOON

8:09 AM · Apr 21, 2021

66. Later that same day, Karony and Smith participated in a question-and-answer session—colloquially, an "AMA" or "Ask Me Anything"—that was live streamed over the internet. During the AMA, Karony clarified that "the LP lock is automated, not automatic." Karony repeated that "situations may require the use of the LP" to "seed[] other exchanges" and "as in the last resort for development costs." Karony once again falsely assured his viewers and listeners, "if we are going to do something with the LP, we'll tell you."

67. Smith was viewable on the left side of the live-stream AMA with Karony, who was viewable on the lower-right section of the screen, and added: "As John was saying, if something comes up that makes sense, we're gonna tell you, and then we're gonna judge our reaction based on your reaction. It's a perfect symbiosis of the community and what we're doing. It's awesome." Karony indicated his approval of Smith's comments by stating, "Yeah. Hundred percent."

68. Despite Karony and Smith's attempts at damage control, after it was disclosed on April 20, 2021 that the SafeMoon LP was not locked as Defendants had described, the SafeMoon Token price plummeted almost 50% the following day.

69. In further response to the "Scam Advisory," SafeMoon submitted its token contract for a third-party audit. The audit concluded that there was no restriction, or "lock," as to the SafeMoon Tokens generated from "taxed" SafeMoon Token transactions. The auditor viewed this as a "major risk" that could "have devastating consequences to the project as a whole." Though the audit recommended restricting control of the SafeMoon LP, SafeMoon instead argued publicly that its team needed "additional control" to make "continued strategic plays in regards to long term growth" and claimed "[r]isks in regard to rug-pulls" are mitigated because "every member of SafeMoon would be subject to litigation and likely a swift prison

sentence . . . [and] our social lives would be in ruin, and we would not be able to show our faces in public again, let alone get another job."

70. Despite assuring their AMA viewers and social media followers on April 21, 2021 that they would "publicly go to the community and let [the community] know if the [SafeMoon] LP will be used and what for, ahead of time," just over two weeks later on May 6, 2021, the Defendants transferred more than $1,200,000 worth of BNB and SafeMoon Tokens from the SafeMoon LP to the SafeMoon Contract Owner Address, without first disclosing to the community any information about the transaction or its purpose.

71. Notwithstanding the Defendants efforts to lull investors during the April 2021 AMA and related tweets, Karony, Smith and Nagy knew, or were reckless in not knowing, that any withdrawals from the SafeMoon LP were contrary to SafeMoon's initial representations to investors that assets within the SafeMoon LP were locked and inaccessible to the Defendants for at least four years.

72. Contrary to their explicit representations, not only did the Defendants have unfettered access to the SafeMoon LP by virtue of their control of LP Tokens, Nagy, Smith, and Karony in fact redeemed LP Tokens to misappropriate millions of dollars' worth of assets from the SafeMoon LP. In practical terms, Nagy, Smith, and Karony burned their LP Tokens through PancakeSwap and received in return a portion of the SafeMoon Tokens and BNB that were held within the SafeMoon LP. These LP Tokens were generated from a portion of the tax on all SafeMoon Token transactions. The Defendants wrongfully redeemed or withdrew the following tokens between March 5, 2021 and May 11, 2022:

| | Unlocked LP Tokens Redeemed | SafeMoon Withdrawn from SafeMoon LP | USD$ Value | BNB Withdrawn from SafeMoon LP | USD$ Value |
|---|---|---|---|---|---|
| Nagy | (4,179.18) | 94,272,298,200,000 | $408,458 | 933 | $273,249 |
| Smith | (40,181.07) | 13,416,224,600,000 | $75,109,074 | 160,894.14 | $77,056,022 |
| Karony | (64,639.69) | 67,452,774,200,000 | $123,563,838 | 107,546.94 | $54,729,971 |

73. The Defendants used the proceeds of these withdrawals, in part, to fund their lavish lifestyles, including to purchase luxury homes, travel and expensive cars. Neither Nagy, Karony, nor Smith alerted SafeMoon Token holders of these withdrawals, as Karony had promised in his April 21, 2021 tweets and as Karony and Smith promised at the April 21, 2021 AMA.

**F. Karony Engaged in Manipulative Trading in the SafeMoon Token**

74. Karony opened an account on a crypto asset trading platform, in which he began trading on April 5, 2021. Between April 9, 2021 and December 31, 2021, Karony executed approximately 227,000 trades in SafeMoon Tokens in this account, which he controlled. Within that account, Karony simultaneously and repeatedly purchased and sold the same number of SafeMoon Tokens at the same price at the same time. The account traded more than 50 trillion SafeMoon Tokens back and forth with itself in this way, with none of the trades resulting in a change in ownership. The wash trading constituted 84.3% of the trades (by count) and 98.8% of the total unit volume. On 188 trading days, or 80% of the 236-day total trading days for the SafeMoon Token, more than 95% of the buys, sells or both in the account were attributable to this wash trading.

**G. Karony and Smith Manipulated the Price of the SafeMoon Token By Using Funds Removed From the SafeMoon LP in Order to Attract Investors**

75. Karony and Smith engaged in additional fraudulent manipulation of the SafeMoon Token by redeeming LP Tokens and then using withdrawn BNB tokens to make large

purchases of SafeMoon Tokens, driving up their value relative to BNB tokens. The opportunity to engage in this manipulation presented itself when PancakeSwap announced in late April 2021 that it would upgrade its standard LP smart contract from version one ("V1") to version 2 ("V2"). Because of the upgrade, PancakeSwap would ultimately discontinue support for liquidity pools created with the V1 smart contract, such as the SafeMoon LP. Liquidity pools created with the V1 smart contract, like the SafeMoon LP, needed to "migrate" their liquidity to a new V2 liquidity pool. Therefore, it was expected that large volumes of liquidity would be transferred from the SafeMoon LP V1 (hereinafter, "SafeMoon LPV1") to a new SafeMoon LP V2 ("SafeMoon LPV2").

76. As a general matter, the migration of liquidity from one liquidity pool to another was a relatively simple process. To accomplish this, liquidity would need to be removed from a V1 liquidity pool by redeeming all current LP tokens (the tokens received for adding liquidity) in exchange for the underlying crypto assets in the liquidity pool. Those crypto assets would then need to be paired together and added as liquidity in a new V2 liquidity pool, in exchange for new LP tokens.

77. In the early morning of May 12, 2021, shortly after midnight, Smith and Karony initiated the migration from the SafeMoon LPV1 to the SafeMoon LPV2, by removing approximately 14,800 BNB and 963 billion SafeMoon Tokens from the SafeMoon LPV1, and shortly thereafter, adding approximately 13,500 BNB and 867 billion SafeMoon Tokens to the SafeMoon LPV2.

**a. The May 12th Manipulation of the SafeMoon Token**

78. On May 12, 2021, beginning at approximately 10:00 a.m., Smith and Karony withdrew approximately 3.8 trillion SafeMoon tokens and 56,940 BNB, worth approximately

$68.6 million total, from the SafeMoon LPV1 in two transactions. Rather than add this liquidity into the SafeMoon LPV2, as the SafeMoon Token investors would have expected, Smith and Karony sold approximately 4.1 trillion SafeMoon Tokens in exchange for approximately $8.83 million in another crypto asset. In a private conversation over Discord, Karony and Nagy discussed a plan to use $830,000 of the proceeds of this transaction for company expenses and to split the remaining $8 million.

79. None of the Defendants publicly disclosed to the SafeMoon community that they would withdraw assets from the SafeMoon LPV1 for personal use.

80. Smith used about 58,220 BNB to purchase more SafeMoon Tokens in the SafeMoon LPV2, causing a dramatic increase in value of the SafeMoon Tokens relative to BNB. As Smith informed Karony just after purchasing about 1 trillion SafeMoon Tokens for 13,220 BNB worth more than $7.9 million:

> [P]eople are going to geek out over that buy I just did to make up the difference in a good way … I did a 13k bnb buy to make the difference on the lost [SafeMoon Tokens from the 10% tax], should have shot the price up. We have 45376 bnb remaining. Clean $30,222,901.20 in bnb on standby, $30m in usdt [referring to the crypto asset known as Tether] incoming. It's a pretty good day and the price is up, win win.

81. Indeed, SafeMoon's investors immediately noticed the dramatic price impact of Smith's large trades. Less than an hour later, Smith used 22,500 BNB worth approximately $13.5 million to purchase about 1.5 trillion SafeMoon from the SafeMoon V2LP. Two minutes later, Smith used another 22,500 BNB worth an additional approximately $13.5 million to buy 1.28 trillion additional SafeMoon Tokens.

82. Through this series of transactions on May 12, Karony and Smith created the artificial appearance of active trading and attempted to raise the price of the SafeMoon Tokens, for the purpose of inducing the purchase of SafeMoon Tokens by others.

**b. The May 19th Manipulation of the SafeMoon Token**

83. On May 19, 2021, Smith messaged Karony on Discord that Smith could "move all the available" liquidity from SafeMoon LPV1 to SafeMoon LPV2. Smith suggested that they instead could remove liquidity from SafeMoon LPV1 and use the resulting BNB to purchase SafeMoon Tokens from SafeMoon LPV2, as they had done the week prior on May 12th. Karony wrote to Smith, "do a v2 bnb buy," meaning, purchase SafeMoon Tokens from SafeMoon LPV2 using BNB removed from SafeMoon LPV1, "if that will increase the price."

84. Karony asked Smith if "we can do it a little slower this time around?" Smith assured Karony that he would "plug it through the day starting when I get back all the way to midnight." This in contrast to Smith's conduct on May 12 when he bought nearly $35 million in SafeMoon Tokens in about one hour.

85. Karony gave Smith detailed instructions on how to trade the SafeMoon Token. For example, Karony told Smith, "lets create a price floor[.]" Karony also asked Smith, "how big of a yeet [purchase of SafeMoon Token] is needed to pump [the price] to 5." Smith assured Karony that he "can just thrash it [i.e., purchase SafeMoon Tokens] just under the diminishing returns until we hit 5 Np [no problem]." Karony replied hopefully, "[i]n all Reality the best thing to do would to be to counter all the sells. Then add 26% [to the price]."

86. Karony told Smith how much SafeMoon Tokens to purchase and when, including detailed instructions such as "50bnb buy [of SafeMoon Token] every 5 minutes" initially, then

"200bnb x 3 then 50bnb x till done." These instructions were followed by corresponding transactions in which Smith executed the manipulative strategy discussed with Karony.

87. In total the Defendants used about 58,221 BNB removed from the LPV1 to purchase SafeMoon Tokens from LPV2, with the intent of manipulating the price of the SafeMoon Tokens higher and, as their internal private conversations show, in order to attract investors to buying SafeMoon Tokens.

88. None of the Defendants publicly disclosed to the SafeMoon community that they would withdraw assets from the SafeMoon LPV1 to purchase additional SafeMoon Tokens or manipulate its market price.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against All Defendants)

89. Paragraphs 1 through 88 are realleged and incorporated herein by reference.

90. Defendants, knowingly or recklessly, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

91. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT II – FRAUD**

**Violations of Sections 17(a)(2) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2)]**
**(Against Defendant Nagy)**

92. Paragraphs 1 through 88 are realleged and incorporated herein by reference.

93. Defendants, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

**COUNT III – FRAUD**

**Violations of Sections 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(3)]**
**(Against All Defendants)**

95. Paragraphs 1 through 88 are realleged and incorporated herein by reference.

96. Defendants, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

97. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

**COUNT IV – FRAUD**

**Violations of Section 10(b) of the Exchange Act**
**and Rules 10b-5(a) and (c) thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]**
**(Rule 10(b)-5(a) and (c) Against All Defendants)**

98. Paragraphs 1 through 88 are realleged and incorporated by reference herein

99. Defendants, knowingly or recklessly, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, (a) employed a device, scheme, and artifice to defraud, and (c) engaged in acts, practices, or a course of business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or prospective purchasers of securities.

100. By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(a) and (c)].

**COUNT V – FRAUD**

**Violations of Section 10(b) of the Exchange Act**
**and Rules 10b-5(b)thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]**
**(Rule 10(b)-5(b) Against Nagy)**

101. Paragraphs 1 through 88 are realleged and incorporated by reference herein.

102. Defendant Nagy, knowingly or recklessly, acting with scienter, and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103. By engaging in the conduct described above, Defendant Nagy violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(b)].

## COUNT VI – FRAUD

**Violations of Section 9(a)(2) of the Exchange Act**
**[15 U.S.C. § 78i(a)(2)]**
**(Against Defendants Karony, Smith, SafeMoon LLC, and SafeMoon US LLC)**

104. Paragraphs 1 through 88 are realleged and incorporated herein by reference.

105. By virtue of the foregoing, Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail, effected, alone or with one of more persons, a series of transactions in a security registered on a national securities exchange, a security not so registered, or in connection with a security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

106. By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## COUNT VII – UNREGISTERED OFFERS AND SALES OF SECURITIES

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**
**(Against All Defendants)**

107. Paragraphs 1 through 88 are realleged and incorporated by reference herein.

108. By virtue of the foregoing, without a registration statement in effect as to any offers or sales of the SafeMoon Token, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use of medium of any prospectus or otherwise; (b) carried or caused to be

carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

109. By engaging in the conduct described herein, Defendants violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

The SEC respectfully requests that the Court enter a Final Judgment:

1. Finding that Defendants committed the violations alleged in this Complaint;

2. Permanently restraining and enjoining Defendants from violations of the following provisions: Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2), 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

3. Permanently prohibiting Defendants, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)], from (i) participating, directly or indirectly, including, but not limited to, through any entity controlled by [Defendants], in any offering of crypto asset securities; provided, however, that such injunction shall not prevent [Defendant] from purchasing or selling any crypto asset security, for [his] own personal account;

4. Ordering Defendants to disgorge all ill-gotten gains from the illegal conduct alleged in this Complaint, plus pay prejudgment interest, pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), (7)];

5. Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court; and

6. Granting any other and further relief this Court may deem just and proper.

**JURY TRIAL DEMAND**

The SEC demands a trial by jury as to all issues that may be so tried.

Dated: November 1, 2023

Respectfully submitted,

/s/ Oren Gleich

Oren Gleich (New York Bar No. 4460135)
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
Tel: (212) 336-0190
gleichor@sec.gov

Dean M. Conway*
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Tel: (202) 551-4412
conwayd@sec.gov

Attorneys for Plaintiff

**Pending admission pro hac vice*

Of Counsel
John Lucas
John S. Crimmins
Pamela Sawhney
Securities and Exchange Commission